## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROBIN L. MERRITT** | **: CIVIL ACTION** |
| | : |
| **v.** | : |
| | **: NO. 17-808** |
| **NANCY BERRYHILL** | : |
| | : |

**KEARNEY, J.** **March 5, 2018**

## MEMORANDUM

Asserting disability arising from fibromyalgia, Robin L. Merritt asks we reverse or remand the Social Security Commissioner's denial of Disability Insurance Benefits and Supplemental Security Income disability benefits. Administrative Law Judge Jay Marku evaluated and weighed the evidence adduced from several physicians and, in detailed findings, denied Ms. Merritt's appeal of the Commissioner's ruling. After the Appeals Council also denied her appeal, Ms. Merritt properly sought our review of Administrative Law Judge Marku's decision. Ms. Merritt argues Administrative Law Judge Marku failed to properly consider and weigh the opinion of Ms. Merritt's treating physician and improperly discounted Ms. Merritt's subjective complaints. Ms. Merritt also argues evidence she first submitted to the Appeals Council warrants remand. After careful review of the record, substantial evidence supports Administrative Law Judge Marku's findings, and the additional evidence first presented to the Appeals Council does not warrant remand. We deny Ms. Merritt's petition for review in the accompanying Order.

## I.  Background

Robin L. Merritt applied for Social Security Disability Insurance benefits on September 18, 2013 claiming disability beginning on September 11, 2012 based on fibromyalgia and residual harm from a L2-3 lateral discectomy.[1]  The Social Security Administration denied her application on November 25, 2013 and she timely filed a request for a hearing.[2]  Administrative Law Judge ("ALJ") Marku presided over a video hearing on July 29, 2015 where he evaluated testimony from Ms. Merritt and vocational expert Dennis Mohn.[3]  On August 21, 2015, ALJ Marku denied Ms. Merritt's claim.[4]  She then filed a Request for Review with the Appeals Council.[5]  The Appeals Council found no reason to review ALJ Marku's decision and denied the Request for Review.[6]  Ms. Merritt then filed this case.[7]

Ms. Merritt is now sixty years old and considered to be of advanced age.[8]  She completed twelve years of formal education.[9]  She worked as an office assistant for Aetna Life Insurance Company from August 1991 to February 2011 for eight hours per day, five days a week.[10]  She then worked at Bartholomew Insurance LLC from July 2012 to September 11, 2012 for four hours per day, three days per week.[11]  In her initial application for Disability Insurance Benefits and Supplemental Security Income, Ms. Merritt claimed she stopped working because of her conditions.[12]  When asked to explain why she stopped working, Ms. Merritt responded "it was a combination of my conditions and an ex-employee that was very nasty at work and I had alot [sic] of pain and anxiety due to the enviorment [sic.]. I had to take alot [sic] of pills inorder [sic] to just to try to proceed at work from my depression and pain from my myalgia."[13]

### A.  Hearing before Administrative Law Judge Marku.

At the July 29, 2015 video hearing before ALJ Marku, Ms. Merritt testified about her duties as an office assistant at Aetna.[14]  She pulled reports on the computer, picked up prints off

2

the printers and handed them out, cleaned up desk areas, and periodically walked back and forth between Aetna's two buildings.[15] She spent about fifty percent of her day sitting and fifty percent of her day standing while working for Aetna.[16] The heaviest weight she lifted was about fifteen pounds.[17]

Ms. Merritt testified she had worked since September 2012, the alleged start date of her disability.[18] She had a job at Weis Markets for two days, as a cashier, but stopped working because her pain returned.[19] She testified the pain from her fibromyalgia and fatigue currently prevents her from working.[20] Her medications do not relieve her pain and physical therapy did not help.[21] Ms. Merritt testified to feeling tingling in her muscles, which goes down both legs and both arms, and to her muscles aching all the time.[22] She testified "I can't keep [my arms] up above my head or carry much because they get so weak and they start to hurt. I mean even washing my hair hurts my arms."[23] Her pain lasts all day, occurs all over her body, and is worsened by moving, walking cleaning, and doing the laundry.[24]

Ms. Merritt testified she is able to walk "maybe a half a block."[25] She can stand "about ten minutes without having to bend over from the pain in my legs and my back."[26] Ms. Merritt can sit for "maybe an hour, hour and a half, and then I have to get up and move."[27] She testified stooping and squatting are difficult because she has trouble getting back up.[28] She has no difficulty using her hands, but "sometimes they get a little shaky."[29] Ms. Merritt testified the most she can lift is "probably five pounds."[30]

Ms. Merritt testified she drives "maybe three times a week" and usually drives "maybe five miles."[31] She admitted she drove to the hearing, which took about forty minutes, but struggled to get out of her car.[32] Ms. Merritt also testified she enjoys watching crime shows on television and can, for the most part, follow the storyline when watching these shows.[33] She is

3

able to do laundry, grocery shop, and some housework.[34] With respect to the housework, Ms. Merritt testified she "[has] to break it up because it's just too painful, you know, so we'll do- I'll do, like one room and then that's it for the day."[35] She showers on her own and is able to cook, but "not big meals."[36] Ms. Merritt testified she sleeps nine to ten hours per night.[37] On a typical day she wakes up, eats breakfast, and then returns to bed for another three hours.[38] She spends a typical day "[sitting] a while, and then, you know, I'll just- I get so fatigued, I can't keep my eyes open, so I have to go lay down. Put a load or two of laundry in. You know, make something to eat. Try to move around. And that's about it."[39]

Ms. Merritt identified Dr. William Liaw as her primary doctor and testified to seeing him about every three months.[40] Regarding the treatment she receives from Dr. Liaw, she testified "[h]e hasn't given me anything- well, the Trazadone he has. But then he sent me to the rheumatologist and to the neurologist."[41] She does not see any other doctor on a regular basis and was not receiving any mental health treatment.[42] She testified she was tested with tender points for fibromyalgia, and testified they were extremely painful.[43] She did not know how many tender points were tested, nor how many were positive.[44] Ms. Merritt testified to having spine surgery for a herniated disk.[45] She had an MRI to confirm whether her pain was from the spine and the MRI showed a bulging disk.[46] Ms. Merritt testified Dr. McConnell, an orthopedic surgeon, said her pain was from fibromyalgia, and not from the bulging disk.[47] She also testified to seeing a neurologist, Dr. Jay Varrato.[48] Dr. Varrato told her "its fibromyalgia and he had two other types of diagnoses, which have to do with the pain in my legs."[49]

Vocational Expert Dennis Mohn testified at the hearing.[50] Mr. Mohn testified he reviewed the exhibits from Ms. Merritt's file before the hearing to learn her vocational background.[51] ALJ Marku then asked Mr. Mohn to describe Ms. Merritt's past work as she

4

actually performed it and as it is generally performed in the national economy.[52] Mr. Mohn testified Ms. Merritt performed past relevant work as an administrative clerk.[53] Regarding the level of exertion required of an administrative clerk, Mr. Mohn testified Ms. Merritt's work was light as she performed it and as described by the *Dictionary of Occupational Titles*.[54]

ALJ Marku posed a series of hypotheticals to Mr. Mohn, through which he asked if a person of Ms. Merritt's age, physical limitations, education, and work history would have the skills necessary to perform semi-skilled or skilled sedentary work.[55] Mr. Mohn testified such a person would have the skills necessary for semi-skilled or skilled sedentary work and such jobs were available in the national economy, as well as in Ms. Merritt's region.[56] Mr. Mohn also testified there were unskilled, sedentary work positions available for a person of Ms. Merritt's age, education, physical limitations, and work history.[57]

## B. Evidence submitted by Ms. Merritt's treating physicians.

ALJ Marku reviewed records from several of Ms. Merritt's physicians, including her primary care physician, Dr. Liaw.[58] Dr. Liaw completed a medical source statement on Ms. Merritt's behalf.[59] The Medical Source Statement form instructs physicians "[i]t is important that you relate particular medical or clinical findings to any assessed limitations in capacity: The usefulness of your assessment depends on the extent to which you do this."[60] Regarding Ms. Merritt's ability to lift and carry objects, Dr. Liaw checked off boxes to indicate Ms. Merritt was able to lift objects up to ten pounds frequently, objects up between eleven and twenty pounds occasionally, and unable to lift objects over twenty-one pounds.[61] Dr. Liaw marked boxes to indicate Ms. Merritt was able to carry objects up to ten pounds occasionally, but was unable to carry objects over ten pounds.[62] When asked to identify the "particular medical or clinical findings (i.e. physical exam findings, x-ray findings, laboratory test results, history, symptoms

5

including pain etc.) which support your assessment or any limitations and why the findings support the assessment," Dr. Liaw did not provide a response.[63]

Regarding Ms. Merritt's ability to sit, stand, and walk at work, Dr. Liaw checked the boxes to indicate Ms. Merritt could sit for two hours without interruption, stand for thirty minutes without interruption, and walk for fifteen minutes without interruption.[64] In a total eight hour work day, Ms. Merritt could sit for four hours, stand for one hour, and walk for thirty minutes.[65] Dr. Liaw stated Ms. Merritt would be lying down or shifting positions due to discomfort for the remaining portion of the eight hour work day.[66] Dr. Liaw again provided no response when asked to identify the particular medical or clinical findings which supported his assessment or any limitations and why the findings supported the assessment.[67]

Regarding Ms. Merritt's use of her hands, Dr. Liaw checked off boxes to indicate Ms. Merritt could perform the following activities with both hands occasionally: reaching (overhead), reaching (all other), handling, fingering, feeling, and push/pull.[68] Regarding Ms. Merritt's use of her feet, Dr. Liaw marked the boxes to indicate she could operate foot controls occasionally for both feet.[69] Again, Dr. Liaw provided no response when asked to identify the particular medical or clinical findings which supported his assessment or any limitations and why the findings supported the assessment.[70] With respect to postural activities, Dr. Liaw checked off boxes to indicate Ms. Merritt could climb stairs and ramps occasionally.[71] He indicated she was unable to climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl.[72] Dr. Liaw provided no response when asked to identify the particular medical or clinical findings which supported his assessment or any limitations and why the findings supported the assessment.[73]

Dr. Liaw checked boxes confirming his view Ms. Merritt could perform activities like shopping, travel without assistance, ambulate without an assistive device, walk a block at a

6

reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene, and sort, handle and use paper/files.[74]  Dr. Liaw did not identify the medical findings supporting his assessment nor explain why the findings support the assessment.[75]  Dr. Liaw did not describe other-work related activities affected by Ms. Merritt's impairments.  He did not state whether the limitations described in the medical source statement had lasted or would last for twelve consecutive months.[76]

In addition to the Medical Source Report, ALJ Marku also reviewed the records from Ms. Merritt's visits to Dr. Liaw.[77]  Ms. Merritt saw Dr. Liaw numerous times from October 12, 2011 to December 2, 2014.[78]  During this over three-year period, her physical exams showed no abnormalities with the exception of one visit for acute sinusitis.[79]  She frequently complained of anxiety, depression, and insomnia.[80]  She first mentioned nerve pain during an April 10, 2012 visit.[81]  In June 2012, Dr. Liaw began prescribing Ms. Merritt medication for nerve pain.[82]  She tried another medication in September 2012, but experienced side effects forcing her to discontinue taking it.[83]  In August 2014, Dr. Liaw noted Ms. Merritt continued to have flare-ups of her fibromyalgia and instructed her to follow up with her rheumatologist.[84]  Ms. Merritt started taking Savella to treat her fibromyalgia symptoms in November 2014.[85]

In early 2013, Ms. Merritt sought treatment from a rheumatologist, Dr. Kristin Ingraham, for her fibromyalgia.[86]  Ms. Merritt first saw Dr. Ingraham on March 5, 2013.[87]  Dr. Ingraham listed Ms. Merritt's current problems as intermittent claudication, telangiectasia, depression, and myalgia.[88]  Ms. Merritt saw Dr. Ingraham again on May 8, 2013, and Dr. Ingraham prescribed her Effexor for her fibromyalgia pain.[89]  Multiple tender points were positive upon Ms. Merritt's physical examination.[90]  Dr. Ingraham noted "sleep and exercise are the cornerstone therapies for

7

fibromyalgia."[91] Dr. Ingraham also instructed Ms. Merritt to "build cardiovascular exercise daily goal to 30-45 minutes."[92] Ms. Merritt returned to Dr. Ingraham on October 28, 2014.[93] Ms. Merritt stopped taking Effexor because of its side effects.[94] Ms. Merritt saw Dr. Ingraham again on December 18, 2014. Dr. Ingraham noted Ms. Merritt had tried Cymbalta, Lyrica, Effexor, Gabapentin, and Flexeril for her fibromyalgia pain, but none of these medications provided relief.[95] Ms. Merritt told Dr. Ingraham she was tolerating Savella, but it was not helping her pain.[96] Dr. Ingraham instructed Ms. Merritt to stop taking Savella, and ordered an MRI of Ms. Merritt's lower back.[97]

Ms. Merritt also saw an orthopedic surgeon, Dr. Jeffrey McConnell, in January 2015.[98] Dr. McConnell reviewed Ms. Merritt's December 30, 2014 MRI. He stated "it was discussed how the most likely cause of her pain is due to her fibromyalgia not the HNP at L2/3."[99] Dr. McConnell prescribed physical therapy for Ms. Merritt to strengthen her legs and core,[100] but the physical therapy did not provide her with any relief.[101]

Ms. Merritt also treated with neurologist Dr. Jay Varrato.[102] In 2012, Dr. Varrato performed an EMG on Ms. Merritt which reported normal.[103] Ms. Merritt returned to Dr. Varrato in May 2015 to treat her fibromyalgia.[104] He noted Ms. Merritt had "pain with predominant when standing but also when walking in the legs. She does also have rest pain which she describes as a dull ache. She notes intermittent paresthesias in both lower extremities. …She has chronic low back pain."[105] Dr. Varrato noted Ms. Merritt "arises from a squat without arms."[106] He also noted "multiple tender points reproducible on today's examination. …Multiple tenderpoints [sic] throught [sic] legs and lat epicondyles of arms."[107] Dr. Varrato performed another EMG on Ms. Merritt on July 14, 2015, which was normal.[108]

8

## C. Opinion of the state agency physicians.

State Agency physician Dr. Gerald A. Gryczko and State Agency psychologist Dr. Dennis Gold reviewed records from Dr. Liaw and Dr. Ingraham.[109] Dr. Gold opined her affective disorders were non-severe.[110] Dr. Gryczko opined Ms. Merritt's fibromyalgia was severe.[111] He stated Ms. Merritt's medically determinable impairments could reasonably be expected to produce her pain, but her statements about its intensity, persistence and functionally limiting effects were not substantiated by the objective medical evidence alone.[112] He found Ms. Merritt to be partially credible.[113] He stated "there is evidence that the claimant stopped working for reasons in addition to the alleged impairment(s). Based on this evidence of record, the claimant's statements are found to be partially credible."[114]

Dr. Gryczko opined Ms. Merritt could occasionally lift and/or carry fifty pounds and frequently lift or carry twenty five pounds.[115] He opined she could stand and/or walk for a total of six hours in an eight hour work day and sit with normal breaks for six hours in an hour work day.[116] He also opined Ms. Merritt had postural limitations.[117] Dr. Gryczko reported, "[t]he claimant's allegations(s) of some limitations in lifting/carrying, bending, standing/walking are credible. However, her allegations of very significant limitations in these activities are not credible."[118]

Dr. Gryczko also determined Ms. Merritt's previous employment at Aetna was Past Relevant Work, and she had the residual functional capacity (RFC) to return to her past relevant work as actually performed.[119] As a result, Dr. Gryczko found Ms. Merritt was not disabled.[120]

## D. Administrative Law Judge Marku's August 21, 2015 decision.

Following the July 27, 2015, hearing, ALJ Marku denied Ms. Merritt's claim on August 21, 2015.[121] ALJ Marku applied the five step analysis in 20 C.F.R. 404.1520(a) to determine

9

whether Ms. Merritt was disabled within the meaning of the Social Security Act.[122] ALJ Marku found Ms. Merritt was not disabled as of September 11, 2012, to the date of his decision.[123]

ALJ Marku found Ms. Merritt had not engaged in substantial gainful activity since September 11, 2012, the alleged onset date.[124] He determined Ms. Merritt suffered from two "severe" impairments: fibromyalgia and "residuals of an L2-3 lateral discectomy."[125] ALJ Marku noted hypertension, intermittent claudication, irritable bowel syndrome, and depression were also medically determinable impairments referenced in the record, but these impairments were not severe as they had no more than "a minimal effect on [Ms. Merritt's] ability to perform basic work functions on a sustained basis.[126]

ALJ Marku found Ms. Merritt's medically determinable mental impairment of depression does not cause more than a minimal limitation in her ability to perform basic mental work activities and, therefore, was non-severe.[127] ALJ Marku explained he made this finding after considering four broad functional areas, known as the "paragraph B criteria" defined in the disability regulations for evaluating mental disorders.[128] First, ALJ Marku found Ms. Merritt had no restriction in her activities of daily living due to her depression.[129] Second, he found Ms. Merritt had no difficulties in social functioning because of her depression.[130] Third, ALJ Marku found Ms. Merritt had no difficulties with concentration, persistence, or pace.[131] ALJ Marku determined Ms. Merritt could sustain the focused attention and concentration required to permit the completion of tasks commonly found in work settings, based on Ms. Merritt's "admissions...that she is able to drive and follow the storyline of a television show (Exhibit 5E, testimony)."[132] Fourth, ALJ Marku found Ms. Merritt had not experienced episodes of decompensation.[133] As such, her medically determinable mental impairment was non-severe.[134]

ALJ Marku noted these criteria were not a residual functional capacity (RFC) assessment and the RFC assessment used at steps four and five of the sequential evaluation process required a more detailed assessment.[135] The RFC assessment required "itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings. …Therefore, the following [RFC] assessment reflects the degree of limitation [I have] found in the 'paragraph B' mental function analysis."[136]

At step three of the analysis, ALJ Marku determined Ms. Merritt's impairments did not meet or medically equal the severity of one of the listed impairments.[137] ALJ Marku explained Ms. Merritt's severe impairments did not meet the criteria of listed impairments described in Appendix 1 of the regulations, and no treating or examining physician had mentioned findings equivalent in severity to the criteria of any listed impairment.[138]

Proceeding to step four, ALJ Marku found Ms. Merritt had the residual functional capacity to perform the full range of light work defined in 20 C.F.R. 1567(b).[139] ALJ Marku considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence.[140] He also considered opinion evidence under 20 C.F.R. 1527.[141] In considering Ms. Merritt's symptoms, ALJ Marku followed a two-step process.[142] First, he determined whether there was an underlying medically determinable physical or mental impairment which could be expected to produce Ms. Merritt's pain or other symptoms.[143] ALJ Marku found Ms. Merritt's medically determinable impairments could reasonably be expected to cause her alleged symptoms and proceeded to step two.[144] At the second step, ALJ Marku evaluated the intensity, persistence, and limiting effects of the Ms. Merritt's symptoms to determine the extent to which they limit her functioning. At this step, when statements about the intensity, persistence, or functionally limiting effects of pain or other

11

symptoms are not substantiated by objective medical evidence, ALJ Marku explained he "must make a finding on the credibility of the statements based on a consideration of the entire case record."[145]

ALJ Marku referred to Ms. Merritt's hearing testimony.[146]  He noted she testified to numerous physical problems including pain through her entire body, muscle aches, fatigue, and tingling in her lower extremities.[147]  Because of her symptoms, Ms. Merritt alleged she cannot sit for more than ten minutes, walk more than a half a block, or lift more than five pounds.[148] ALJ Marku noted Ms. Merritt alleged difficulty with stooping and squatting and with reaching overhead.[149]  Ms. Merritt also testified "although she has seen a primary care physician, a rheumatologist, and a neurologist, neither the physical therapy nor the prescribed medication has helped with her pain."[150]

ALJ Marku recited Ms. Merritt enjoys watching crime shows on television and is able to follow the storyline for the most part.[151]  He also noted she drives a distance of about five miles three times per week, but admitted to driving to the hearing herself, which took about forty minutes.[152] ALJ Marku determined Ms. Merritt's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but her statements about the intensity, persistence and limiting effects of her symptoms were not entirely credible "for the reasons explained in this decision."[153]

Ms. Merritt described several physical problems due to pain throughout her body resulting in fatigue, but ALJ Marku did not find her testimony entirely credible.[154] ALJ Marku cited Dr. Liaw's records from October 2011 through December 2014.[155]  "His treatment notes document occasional allegations of leg cramps and pain in [Ms. Merritt's] bilateral extremities. However, her actual physical examinations are essentially normal."[156]  Dr. Liaw also reviewed

12

the records from Ms. Merritt's rheumatologist, Dr. Ingraham, and her neurologist, Dr. Varrato.[157] "Both departments note complaints of bilateral lower extremity pain and discomfort. …However, upon physical examination, the claimant exhibited normal muscle bulk and overall muscle tone."[158] Although there were multiple tender points found throughout the legs and epicondyles of the arms, "light touch, vibration and pinprick were normal. Further, the claimant exhibited normal gait, normal coordination, and normal reflexes."[159]

In reviewing Dr. Ingraham's records, ALJ Marku noted reports of diffuse muscular pain from Ms. Merritt.[160] Ms. Merritt reported difficulty with activities including walking, climbing steps, and overhead reaching, such as when brushing her hair.[161] "Nevertheless, lab and vascular workups were negative and physical examinations were essentially normal."[162] ALJ Marku also reviewed the records of Ms. Merritt's MRI of her lumbar spine, which "revealed minimal enhancement along the left lateral aspect of the L2-three disc, which likely reflects granulation tissue from prior surgery."[163] ALJ Marku noted Ms. Merritt "reports Dr. McConnell does not recommend additional spinal surgery because he believes the pain she is experiencing is related to her fibromyalgia."[164] Based on this evidence, ALJ Marku limited Ms. Merritt to a full range of light work.[165] "Despite the objective medical evidence revealing legitimate sources and signs of pain, the objective findings upon actual physical examination and diagnostic testing do not support disabling limitations."[166]

In concluding the objective findings did not support disabling limitations, ALJ Marku considered the opinions given by a treating physician.[167] He noted the record showed only one opinion, from Dr. Liaw, given in the January 2014 Medical Source Statement.[168] Dr. Liaw opined Ms. Merritt is "capable of lifting up to twenty pounds occasionally and ten pounds frequently."[169] He also opined Ms. Merritt is capable of "sitting for a total of 4 hours in an 8-hour

13

workday, 2 hours at a time; standing a total of 1 hour in an 8-hour workday, 30 minutes at a time; and walking for a total of 30 minutes in an 8-hour workday, 15 minutes at at time."[170] Dr. Liaw opined Ms. Merritt can occasionally use her hands and feet, as well as climb ramps and stairs.[171] Dr. Liaw found, however, Ms. Merritt cannot do other postural activities and has environmental limitations.[172] ALJ Marku afforded some weight to Dr. Liaw's opinion with respect to the lifting limitations, but found the remaining restrictions unsupported by the medical evidence.[173]

ALJ Marku also reviewed the assessments made by the state agency medical and psychological consultants regarding Ms. Merritt's ability to perform basic work activities.[174] State agency psychological consultant, Dr. Dennis Gold, opined Ms. Merritt's psychological impairment was not severe.[175] ALJ Marku granted great weight to Dr. Gold's opinion because his analysis was consistent with the record as a whole.[176] ALJ Marku granted little weight to the opinion of State Agency medical consultant Dr. Gerald A. Gryczko, who opined Ms Merritt was capable of medium exertional work with occasional postural limitations.[177] ALJ Marku gave this opinion little weight because it conflicted with the opinion of Ms. Merritt's treating physician, Dr. Liaw.[178] ALJ Marku also noted new objective evidence indicated Ms. Merritt was more limited than as assessed by Dr. Gryczko.[179]

ALJ Marku found Ms. Merritt capable of performing past relevant work as an administrative clerk, and found this work did not require performing work-related activities precluded by her residual functional capacity.[180] Ms. Merritt testified to past work in the administration field, and vocational expert Dennis Mohn testified Ms. Merritt's work experience is listed in the *Dictionary of Occupational Titles* as administrative clerk.[181] An administrative clerk job is a light exertional, semi-skilled job.[182] Because Ms. Merritt worked at this occupation within the last fifteen years, long enough to learn the job and at substantial gainful activity levels,

14

ALJ Marku found this occupation qualified as past relevant work.[183]

Mr. Mohn also testified "that a person with [Ms. Merritt's] characteristics could perform her past relevant work as an administrative clerk, as generally and actually performed."[184] Because Ms. Merritt is able to perform a full range of light work, ALJ Marku found Mr. Mohn to be credible, and adopted his opinion "[Ms. Merritt] can meet the physical and mental demands of her past work."[185] ALJ Marku concluded Ms. Merritt had not been under a disability as defined in the Social Security Act from September 11, 2012, through the date of the decision.[186]

### E. Ms. Merritt's evidence first submitted to the Appeals Council.

Ms. Merritt submitted statements from three of her acquaintances to the Appeals Council which she did not offer to ALJ Marku.[187] The letters from Kathleen Turtzo, Risa Donegan, and Dorothea Daubert discuss Ms. Merritt's physical and mental deterioration beginning in 2012.[188] The letters describe Ms. Merritt as being very active and social before the onset of her fibromyalgia, and describe the changes each observed in Ms. Merritt following the onset.[189] The letters all report Ms. Merritt became less social as her pain worsened, and reflect her struggle to walk more than a short distance.[190]

Ms. Merritt also submitted additional records from Dr. Varrato, which included the results of a November 19, 2015 brain MRI and a December 2, 2015 cervical spine MRI.[191] Following the hearing with ALJ Marku, Ms. Merritt saw Dr. Varrato two more times on November 3, 2015 and December 18, 2015.[192] Dr. Varrato reviewed the results of Ms. Merritt's brain MRI at the second visit, and reported "MRI unusual shows some white matter change in the medulla brainstem and subinsular white matter. May be chronic. I cannot say for certain this has anything to do with chronic symptoms of fibromyalgia and myofascial [sic] pain."[193]

Ms. Merritt submitted an additional letter from Dr. Liaw, dated January 20, 2016, and the

report of a thoracic MRI performed on January 13, 2016.[194] Much of the contents of Dr. Liaw's letter are reflected in his treatment notes and the medical source statement.[195] Dr. Liaw writes "also last year, [Ms. Merritt] developed headaches and memory problems. She had an abnormal MRI of her brain with a subsequent lumbar tap. She is seeing a neurologist (Dr. Jay Varrato) and her workup is ongoing regarding this issue."[196] The letter concludes "her symptoms have progressively gotten worse to the point where she can no longer sustain meaningful employment."[197] Dr. Varrato ordered the thoracic spine MRI.[198]

The Appeals Council denied Ms. Merritt's claim.

## II. Analysis

Ms. Merritt timely filed a request for review in this Court. She argues ALJ Marku erred by (1) failing to accord proper weight to the medical opinions of record and (2) finding her subjective complaints about her symptoms not entirely credible. Ms. Merritt also argues new and material evidence submitted to the Appeals Council warrants remand. We deny Ms. Merritt's objections, and affirm ALJ Marku's findings based on substantial evidence. We also find the additional evidence submitted to the Appeals Council does not warrant remand.

Our review of ALJ Marku's decision is deferential and his findings of fact are conclusive if supported by substantial evidence.[199] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[200] Substantial evidence is "more than a mere scintilla but must be somewhat less than a preponderance of the evidence."[201] To determine whether substantial evidence supports a factual finding, we review the record as a whole.[202] We are bound by ALJ Marku's factual findings if supported by substantial evidence, even if we would have decided the matter differently.[203]

ALJ Marku must determine whether Ms. Merritt is disabled when examining a challenge

to the Commissioner's initial decision denying benefits. Under Title II of the Social Security Act ("Act"), a person who has contributed to the program who suffers from a physical or mental disability is afforded insurance benefits.[204] Under Title XVI of the Act, a disabled person may also be entitled to supplemental security income.[205] A disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[206] A claimant is only disabled if his impairments are severe to the point it makes his previous work impossible to do or precludes any other kind of gainful work available in the national economy.[207]

The Commissioner applies a five-step evaluation to determine if a claimant is disabled.[208] If the Commissioner finds disability or non-disability at any step during the analysis, the Commissioner will end the analysis.[209] Under step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.[210] If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two and is required to determine whether the claimant is suffering from a severe impairment or combination of impairments.[211] Under step three, if the claimant's impairments are severe, the Commissioner compares the impairments to a list of impairments presumed severe enough to preclude gainful employment.[212] If the claimant's impairments or its equivalent matches a listed impairment, the claimant is presumed disabled.[213] If the claimant's impairments do not match impairments on the list, the Commissioner proceeds to step four, where the Commissioner determines the claimant's residual functional capacity ("RFC").[214] A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[215] In step five, if the claimant is unable to return to past work, the Commissioner must prove "there are other jobs existing in

significant numbers in the national economy which claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]."[216]

## A. ALJ Marku properly weighed the medical evidence and relied upon substantial evidence to decline Ms. Merritt's claim.

Ms. Merritt argues ALJ Marku erred by giving some weight to Dr. Liaw's opinion, but rejecting all other aspects of his opinion as unsupported by medical evidence in determining she is capable of returning to her past relevant work. Ms. Merritt also argues ALJ Marku failed to properly consider Dr. Ingraham's finding of multiple positive tender points and failed to properly consider Dr. McConnell and Dr. Varrato's statements, both of whom reported Ms. Merritt's symptoms were likely related to fibromyalgia.

"The ALJ- not the treating or examining physicians or State agency consultants- must make the ultimate disability and RFC determinations."[217] "The law is clear…that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."[218]

A treating physician's opinion is entitled to controlling weight when it is supported by acceptable clinical and laboratory diagnostic techniques, and is consistent with other evidence in the record.[219] A treating source's opinion may be rejected if there is contradictory medical evidence in the record, if there insufficient clinical data, if the opinion is contradicted by the physician's own treating notes, or if the opinion is contradicted by the patient's activities of daily living.[220] An ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."[221] An ALJ is entitled to accord a treating physician's opinion lesser weight when it is provided in a check-box form and does not provide any reasons in support of in support of the physician's various conclusions.[222] "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."[223] In addition, our court of appeals instructs us when a treating source's notes,

18

analyzed as a whole, contradict the treating source's opinion on a claimant's ability to work, the ALJ "may properly rely on those notes in determining the opinion is entitled to little or no weight."[224]

We are aware of the unique difficulties associated with diagnosing fibromyalgia, as there are no objective tests which conclusively confirm the disease.[225] It appears the only present way to identify fibromyalgia objectively is a tender point test.[226] We note, however, ALJ Marku accepted Dr. Liaw's diagnosis of fibromyalgia[227] and acknowledged Ms. Merritt's positive tender point test.[228] ALJ Marku found Dr. Liaw's opinion of Ms. Merritt's work-related limitations due to her impairments, except for his opinion with respect to the lifting limitations, was unsupported by the medical evidence.

ALJ Marku's decision to afford lesser weight to Dr. Liaw's opinion is supported by substantial evidence. Dr. Liaw provided his opinion in a check-box form of the Medical Source Statement. Although Dr. Liaw checked off boxes on the form, he never identified medical or clinical findings to support his assessment of Ms. Merritt's limitations, let alone explain why such findings supported his assessment, even though the Medical Source Statement prompts the individual completing the form to do so for each category of limitations. An opinion provided in the form of checked-off boxes, without more, is weak evidence at best, and ALJ Marku correctly afforded Dr. Liaw's opinion lesser weight. It certainly does not, without more, constitute substantial evidence.

ALJ Marku's decision to afford lesser weight to Dr. Liaw's opinion is also supported by his treatment records. Although the records discuss Ms. Merritt left her job at Aetna and was job hunting, they do not mention limitations on Ms. Merritt's ability to perform work-related activities as a result of her fibromyalgia. Dr. Liaw's notes contradict his opinion of Ms. Merritt's

work-related limitations, and ALJ Marku properly relied on these notes in affording lesser weight to Dr. Liaw's opinion. Similarly, the treatment records from Dr. Ingraham, Dr. Varrato, and Dr. McConnell do not discuss work-related limitations resulting from Ms. Merritt's fibromyalgia pain.

ALJ Marku makes the final decision on Ms. Merritt's residual functional capacity, and in determining Ms. Merritt able to perform her past relevant work as an administrative clerk, reviewed all these records. As such, ALJ Marku's opinion of Ms. Merritt's residual functional capacity is supported by substantial evidence.

## B. ALJ Marku properly analyzed Ms. Merritt's subjective complaints.

Ms. Merritt argues ALJ Marku's reasons for discounting her subjective complaints are not supported by the record. Ms. Merritt contends ALJ Marku improperly discredited her statements concerning the intensity, persistence and limiting effects of her symptoms on her ability to work.

An ALJ must give great weight to the claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence.[229] An ALJ "must give 'subjective complaints serious consideration...and make specific findings of fact, including credibility as to [a claimant's] residual functional capacity.'"[230] A claimant's statements concerning her symptoms must be carefully considered, but the ALJ is not required to credit them.[231] An ALJ can reject such claims if he does not find them credible.[232]

ALJ Marku's determination of Ms. Merritt's credibility is supported by substantial evidence. ALJ Marku determined Ms. Merritt's statements concerning the intensity, persistence, and limiting effects of her symptoms with regard to her ability to work were not entirely

credible. Ms. Merritt testified she could not lift more than five pounds, but Dr. Liaw's opinion of Ms. Merritt's lifting restrictions, which ALJ Marku determined was supported by medical evidence, provided she could lift up to ten pounds frequently, and up to twenty pounds occasionally. In light of Dr. Liaw's opinion, ALJ Marku properly determined Ms. Merritt's statements regarding her lifting limitations were not entirely credible.

To the extent ALJ Marku must give great weight to Ms. Merritt's subjective testimony regarding her inability to perform even light or sedentary work, ALJ Marku is only required to give such testimony great weight when it is supported by competent medical evidence. ALJ Marku determined Dr. Liaw's opinions, other than his opinions regarding her lifting limitations, were not supported by medical evidence, and noted his treatment notes did not mention any work-related limitations as a result of her fibromyalgia. Nowhere in Dr. Liaw's treatment notes does it state Ms. Merritt is unable to work. Moreover, after reviewing Dr. Liaw's treatment notes, ALJ Marku found Ms. Merritt made few complaints regarding her fibromyalgia pain to Dr. Liaw.

The treatment notes of the other three examining physicians are similarly devoid of reference to work-related limitations caused by Ms. Merritt's fibromyalgia. Although Ms. Merritt reported her pain to these physicians, none of the physicians discuss whether this pain prevents Ms. Merritt from working. In addition, vocational expert Dennis Mohn determined Ms. Merritt could perform her past relevant work after listening to her testimony and reviewing her medical records, and ALJ Marku afforded great weight to his opinion. Reviewing all of this evidence, ALJ Marku found Ms. Merritt's testimony regarding the limiting effects of her symptoms was not entirely credible, and his decision is supported by substantial evidence.

**C. The evidence first submitted to the Appeals Council does not warrant remand.**

Ms. Merritt contends the new and material evidence she submitted to the Appeals Council after ALJ Marku's decision warrants remand for consideration by the ALJ. Ms. Merritt argues good cause exists to excuse her failure to present the letters from her acquaintances to the ALJ because she could not have fairly known of the importance of this information before ALJ Marku's unfavorable decision. With respect to the additional records from Dr. Varrato and the thoracic spine MRI report, Ms. Merritt argues good cause exists to excuse her failure to present these records to ALJ Marku because they did not exist at the time of his decision. With respect to Dr. Liaw's letter, Ms. Merritt contends good cause exists to excuse her failure to present such a letter to ALJ Marku because Ms. Merritt could not have anticipated ALJ Marku's failure to accord weight to Dr. Liaw's opinions. In other words, Ms. Merritt wishes she could have known the factors applied by ALJ Marku and she then would have presented more information. But these factors are well established.

"Evidence first presented to the district court must not only be new and material but also supported by a demonstration by the claimant of 'good cause for not having incorporated the new evidence into the administrative record.'"[233] Evidence is new if it is not merely cumulative of what is already in the record.[234] Evidence is material if it is relevant and probative.[235] "Beyond that, the materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination."[236] In addition, evidence is not material if it concerns "a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition."[237]

To satisfy the good cause requirement, the claimant must provide "some justification for the failure to acquire and present such evidence to the Secretary."[238]

22

No statute allows us to evaluate the substantial evidence based on the new and material evidence never presented to the ALJ.[239] Instead, the Social Security Act allows us to remand the case to the Commissioner for these fact determinations, "but only if the claimant has shown good cause why such new and material evidence was not presented to the ALJ."[240] A claimant's failure to realize the importance of obtaining relevant evidence before appearing in front of an ALJ does not establish the requisite good cause.[241]

Ms. Merritt's proffered additional evidence first presented to the Appeals Council does not warrant remand. The letters from Ms. Merritt's acquaintances are new in the sense they were not provided to ALJ Marku. Even assuming these letters were material, as they are relevant, we cannot say there is a reasonable possibility the letters would have changed the Commissioner's decision, nor has Ms. Merritt shown good cause to explain her failure to provide them to ALJ Marku. The regulations provide "[w]e will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work."[242] With respect to nonmedical sources, "[w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, … and observations by our employees and other persons."[243] Since the regulations confirm the Commissioner will evaluate observations by other persons when making the disability determination, Ms. Merritt cannot say she was unaware of the importance of such evidence. The regulations provided her with an opportunity to provide such evidence both in her initial application as well as to ALJ Marku, and she has not justified her failure to do so. As such, these letters do not warrant remand.

The additional records from Dr. Varrato and the thoracic spine MRI report do not warrant

remand. While the records and the report are new, as they provide information on MRIs performed on Ms. Merritt after the hearing, they are not material. Aside from discussing the MRI reports, Dr. Varrato's treatment notes do not provide additional information not included in the records reviewed by ALJ Marku. The thoracic spine MRI report contains the findings of the MRI and nothing more. With respect to MRI reports, we already found the only objective way to identify fibromyalgia is through a tender point test.[244] In addition, Dr. Varrato admitted he could not conclusively link the results of Ms. Merritt's brain MRI to her fibromyalgia.[245] Because MRI reports cannot objectively identify fibromyalgia, and Dr. Varrato's admission relating the same, we cannot say this evidence would have changed the outcome of the Commissioner's determination. As such, the additional records from Dr. Varrato and the thoracic spine MRI report do not warrant remand.

Dr. Liaw's January 20, 2016 letter does not warrant remand. Much of the information contained in the January 20, 2016 letter is already reflected in Dr. Liaw's treatment notes and on the medical source statement, as reviewed by ALJ Marku. To the extent the letter provides new information, the letter discusses medical issues, headaches and memory problems, which developed after Ms. Merritt's hearing before ALJ Marku, and evidence of a later-acquired disability is not material. The other new information is Dr. Liaw's opinion Ms. Merritt can no longer sustain meaningful employment. As this statement is based on information which was before ALJ Marku, we cannot say this statement alone would have changed the Commissioner's decision.

Even if we were to assume the materiality of this statement, Ms. Merritt has not shown good cause for failing to provide Dr. Liaw's letter to ALJ Marku. Ms. Merritt chose to provide Dr. Liaw's opinion to ALJ Marku in the form of a medical source statement. She was aware ALJ

Marku would be considering the opinion of her treating physician, and so she was aware of the importance of providing this information to ALJ Marku. Ms. Merritt's decided to have her treating physician give his opinion through a check-box medical source statement. She later learned this quantum of evidence may not suffice. But she does not then update Dr. Liaw's existing evidence at a later date. As such, Dr. Liaw's letter does not warrant remand.

## III. Conclusion

In the accompanying Order, we deny Ms. Merritt's Petition for Review and dismiss her case. ALJ Marku reviewed extensive medical evidence spanning several years in determining whether Ms. Merritt's fibromyalgia and residual pain from her L2-3 discectomy were disabling. ALJ Marku acknowledged Ms. Merritt's limitations from fibromyalgia but found Ms. Merritt was capable of returning to her past relevant work, and thus is not disabled. We find the additional evidence submitted to the Appeals Council does not warrant remand, as much of the evidence is not material, and Ms. Merritt has not shown good cause to excuse her failure to provide the evidence to ALJ Marku.

Our review today is not based on whether we would arrive at the same conclusion as ALJ Marku. We only determine whether ALJ Marku's findings are based on substantial evidence from the record after considering the weight assigned to the evidence before him. ALJ Marku provided ample detailed reasons supporting his assignment of weight to the opinion of Dr. Liaw and his credibility determination with respect to Ms. Merritt's subjective complaints. We deny Ms. Merritt's objections and affirm ALJ Marku's decision as supported by substantial evidence.

[1] ECF Doc. No. 8, Social Security Administrative Record ("R.") at R. 63. Ms. Merritt initially claimed her disability began on February 28, 2011, but amended the start date to September 11, 2012 during her hearing before Administrative Law Judge Marku. R. 47.

[2] R. 27.

[3] *Id.*

[4] R. 24.

[5] R. 23.

[6] R. 1.

[7] ECF Doc. No. 9.

[8] R. 63.

[9] R. 45.

[10] R. 150.

[11] *Id.*

[12] R. 149.

[13] *Id.*

[14] R. 46.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] R. 47.

[19] *Id.*

[20] R. 48.

26

[21] R. 49.

[22] R. 49-50.

[23] R. 50.

[24] *Id.*

[25] *Id.*

[26] R. 51.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] R. 45.

[32] *Id.*

[33] R. 51-52.

[34] R. 53-54.

[35] R. 54.

[36] R. 53.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] R. 50.

[41] *Id.*

[42] R. 51.

[43] R. 55.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] R. 56.

[50] *Id.*

[51] R. 57.

[52] R. 58.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] R. 59.

[58] R. 315.

[59] *Id.* The purpose of the medical source statement is "to determine [the] individual's ability to do work related activities on a regular and continuous basis." Regular and continuous basis is defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* The Medical Source Statement is a check-box form which also allows physicians to explain the medical findings supporting their conclusions. *Id.* To the extent Dr. Liaw provided his opinion on this form, he did so by checking the boxes on the form. *Id.*

[60] *Id.*

[61] *Id.* The Medical Source Statement defines occasionally as "very little to one-third of the time." *Id.* The Medical Source Statement defines frequently as "one-third to two-thirds of the time."

[62] *Id.*

[63] *Id.*

[64] R. 316.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] R. 317.

[69] *Id.*

[70] *Id.*

[71] R. 318.

[72] *Id.*

[73] *Id.*

[74] R. 320.

[75] *Id.*

[76] *Id.*

[77] R. 249-282, 377-411.

[78] *Id*.

[79] *Id.*

[80] R. 251, 254, 256, 258, 270-272, 274, 382, 386, 390, 396, 399.

[81] R. 272.

[82] R. 269.

[83] R. 264.

[84] R. 386.

[85] R. 382.

[86] R. 288.

[87] *Id.*

[88] R. 288-291.

[89] R. 297.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] R. 374.

[94] *Id.*

[95] R. 420.

[96] *Id.*

[97] R. 421.

[98] R. 478.

[99] *Id.*

[100] *Id.*

[101] R. 462.

[102] R. 471.

[103] R. 472.

[104] *Id.*

[105] *Id.*

[106] R. 474.

[107] R. 475.

[108] R. 481.

[109] R. 64-65. Dr. Gryczko's report is dated November 18, 2013, and he did not review records of doctor's visits after this date.

[110] R. 66.

[111] *Id.*

[112] R. 68.

[113] *Id.*

[114] R. 69.

[115] R. 68.

[116] R. 69.

[117] *Id.*

[118] *Id.*

[119] R. 70.

[120] *Id.*

[121] R. 24.

[122] R. 28.

[123] R. 36.

[124] R. 29.

[125] R. 30.

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] R. 31.

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] R. 32.

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] R. 32-33.

[144] R. 33.

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] R. 34.

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] R. 35.

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] R. 36.

[185] *Id.*

[186] *Id.*

[187] R. 212-216.

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] R.485-515.

[192] R. 485, R. 493.

[193] R. 497.

[194] ECF Doc. 9 at Exs. A, B.

[195] ECF Doc. 9 at Ex. A.

[196] *Id.*

[197] *Id.*

34

[198] *Id.* at Ex. B.

[199] *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).

[200] *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005)).

[201] *Id.* (quoting *Rutherford,* 399 F.3d at 552) (internal quotations omitted).

[202] *Id.* (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir.1999)).

[203] *Trinh v. Astrue*, 900 F. Supp. 2d 515, 518 (E.D. Pa. 2012) (citing *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)).

[204] 42 U.S.C. § 423(a)(1)(D).

[205] 42 U.S.C. § 1381 *et seq*.

[206] 42 U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A).

[207] *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

[208] *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).

[209] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[210] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability if claimant is engaged in substantial gainful activity).

[211] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability if claimant's impairments are not severe).

[212] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[213] *Id.*

[214] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[215] *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001).

[216] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Plummer*, 186 F.3d at 428.

[217] *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

[218] *Id.* (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)).

[219] *Miller v. Berryhill*, No. 16-521, 2017 WL 3648494, at *3 (E.D. Pa. Aug. 22, 2017) (citing 20 C.F.R. § 416.927(c)(2)).

[220] *Id.* (internal citations omitted).

[221] *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985)).

[222] *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008).

[223] *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

[224] *Smith v. Astrue*, 961 F. Supp. 2d 620, 643 (D. Del. 2013) (citing *Dula v. Barnhart*, 129 F. App'x 715, 719 (3d Cir. 2005)); *Humphreys v. Barnhart*, 127 F. App'x 73, 76 (3d Cir. 2005).

[225] *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003).

[226] *Jusino v. Barnhart*, No. 01-4902, 2002 WL 31371988, at *7 (E.D. Pa. Oct. 21, 2002).

[227] R. 30.

[228] R. 34.

[229] *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999).

[230] *Brown v. Astrue*, 649 F.3d 193, 197 (3d Cir. 2011) (quoting *Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002)).

[231] *Chandler*, 667 F.3d at 363 (citing SSR 96-7p, 1996 WL 374186 (S.S.A. 1996)). S.S.R. 96-7p was superseded by S.S.R. 16-3 on October 25, 2017. However, ALJ Marku relied on S.S.R. 96-7p in his decision which remained in effect. R. 32.

[232] *Schaudeck*, 181 F.3d at 429.

[233] *Matthews v. Apfel*, 239 F.3d 589, 592-93 (3d Cir. 2001) (quoting *Szubak v. Sec'y of HHS*, 745 F.2d 831, 833 (3d Cir. 1984)).

[234] *Szubak*, 745 F.2d at 833.

[235] *Id.*

[236] *Id.*

[237] *Id.*

[238] *Id.* at 834 (quoting *Brown v. Schweiker*, 557 F. Supp. 190, 192 (M.D. Fla. 1983)).

[239] *Id.* at 594.

[240] *Matthews*, 239 F.3d at 594.

[241] *See Matthews*, 239 F.3d at 593 (Matthews argued she did not realize the importance of obtaining a vocational evaluation of her arithmetic skills early in the proceedings. The court found she should have known her ability to work was an issue at the ALJ hearing held after remand by the Appeals Council, and she did not show good cause as to why she did not obtain this evidence for the ALJ proceeding.)

[242] 20 C.F.R. §404.1529(a).

[243] 20 C.F.R. §404.1529(c)(3).

[244] *Jusino*, 2002 WL 31371988, at \*7.

[245] R. 497.